UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present: Chief Judge Decker, Judges Ortiz and Causey
Argued at Fairfax, Virginia

KEELEY REID

MEMORANDUM OPINION* BY
v.        Record No. 0985-21-4        JUDGE DANIEL E. ORTIZ
APRIL 12, 2022

WARREN COUNTY DEPARTMENT
  OF SOCIAL SERVICES

FROM THE CIRCUIT COURT OF WARREN COUNTY
Dennis L. Hupp, Judge Designate

(Jason E. Ransom, on brief), for appellant. Appellant submitting on
brief.

Caitlin Jordan (Robert F. Beard; Sarah Orris, Guardian *ad litem* for
the minor child; Robert F. Beard, PLC; Orris Law Firm, on brief),
for appellee.


Keeley Reid ("mother") appeals the termination of her parental rights with respect to her

son ("J.P.") by the Circuit Court of Warren County. On appeal, she argues the circuit court erred

in terminating her parental rights under Code § 16.1-283(C)(2) because the Warren County

Department of Social Services ("the Department") did not show by clear and convincing

evidence that it provided mother with reasonable services. Mother argues that because the

Department failed to satisfy the statutory criteria, this Court should reverse the circuit court's

termination decision. However, because the record contains sufficient evidence to support the

circuit court's decision that the Department provided reasonable services under the particular

circumstances, we affirm the termination of mother's parental rights.

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

BACKGROUND[1]

On May 8, 2020, thirty-one-year-old mother arrived at the Warren Memorial Hospital emergency department in Front Royal, Virginia, with four-year-old J.P. Mother told the hospital staff she had worms in her skin, hair, mouth, and nose and reported chest pain. She said she feared J.P. also had worms. During mother's examination, she repeatedly tried to show the examining doctor the worms. The examining doctor did not find worms but observed track marks and scabs on mother's arm and suspected mother was delusional. Mother admitted to hospital staff that she used methamphetamine and heroin in the days before coming to the hospital. Hospital staff screened mother's urine sample for drugs, and mother tested positive for methamphetamine, opiates, and amphetamine. Hospital staff also noticed J.P. was still drinking from a baby bottle and wearing diapers at four years old.

Concerned for J.P.'s welfare, hospital staff contacted Child Protective Services. Family Services Specialist Rachel Oden went to the hospital to investigate the situation. At the hospital, Oden spoke with J.P.'s maternal grandfather, Walter Peacemaker, who drove mother and J.P. to the hospital. Peacemaker said he would be able to care for J.P. if mother was admitted to the hospital. When Oden spoke with mother about CPS's involvement, mother admitted drug use. During this conversation, mother became angry and was yelling and pacing around the room. She left the hospital twice during the conversation and refused to sign a safety plan placing J.P. with Peacemaker. Due to mother's erratic behavior and refusal to sign the safety plan, the

---

[1] The record in this case was sealed. Nevertheless, the appeal necessitates unsealing relevant portions of the record to resolve the issues mother has raised. Evidence and factual findings below that are necessary to address the assignments of error are included in this opinion. Consequently, "[t]o the extent that this opinion mentions facts found in the sealed record, we unseal only those specific facts, finding them relevant to the decision in this case. The remainder of the previously sealed record remains sealed." *Levick v. MacDougall*, 294 Va. 283, 288 n.1 (2017).

Department determined it could no longer place J.P. with Peacemaker. The Department assumed emergency custody of J.P. that same day and placed him in a therapeutic foster home.

On May 11, 2020, the Department filed a petition for removal and the juvenile and domestic relations district court ("the JDR court") granted the Department temporary custody of J.P. in an emergency removal hearing. In the meantime, Family Services Specialist Ana Portillo called three relatives mother gave the Department contact information for, but each relative was unable to care for J.P. On May 15, 2020, the JDR court held a preliminary removal hearing, and it again granted the Department custody of J.P. Also that day, Portillo met with mother to complete a visitation plan and discuss information releases. The visitation plan allowed mother weekly, supervised visits with J.P. as well as phone and FaceTime calls. Portillo summarized this meeting in a letter to mother on May 19, 2020, and asked mother for contact information for other possible relative placements.

On June 4, 2020, Portillo administered a urine drug screen, and mother tested positive for amphetamine, methamphetamine, and methadone. On June 10, 2020, Portillo sent relative letters asking known relatives if they could provide help and support to mother and J.P. Meanwhile, on May 26 and June 2, 2020, mother missed or was over ten minutes late to scheduled visitation video calls with J.P.

On June 12, 2020, the JDR court entered an adjudicatory order finding J.P. was abused or neglected and ordered the Department to prepare a foster-care plan ("the plan"). On June 16, 2020, Portillo and mother worked together to prepare the plan. The plan's goal was to return J.P. home with a concurrent goal of relative placement. The plan required mother to avoid drug use, submit to drug screens, complete evaluations to determine appropriate services, complete background checks, sign information releases, and provide the Department with financial information. Mother was also to prepare and follow a visitation plan consistently, obtain suitable

- 3 -

accommodations, and attend and participate in all meetings regarding J.P., including Family Assessment and Planning Team ("FAPT") meetings. The plan required the Department to provide drug screens, arrange visitation, invite mother to meetings, and pursue relative placements. The plan stated if mother "wishes to receive substance abuse counseling or treatment she will advise the [Department] foster care worker of her request in writing" and the Department will consider the proper level of treatment. After they prepared the plan, mother continued to miss or appear late to video calls with J.P. on June 16, July 7, July 14, and July 21, 2020.

On July 2, 2020, the JDR court held a dispositional hearing and entered an order that transferred custody of J.P. to the Department and approved the plan. On the Department's motion, the JDR court issued mother a three-ring binder, known as a "parent binder," in which she was to keep all documentation. She was ordered to bring the parent binder to all meetings. After court, Portillo administered a drug test and mother again tested positive for methamphetamine and methadone. Portillo and mother scheduled a follow-up appointment on July 9, 2020, to review the plan and work on transitioning from virtual visitation to in-person visitation.

However, on July 9, 2020, a few minutes before the appointment, mother told Portillo she could not make it because she did not have transportation. They rescheduled the appointment to the next day, but mother canceled this appointment as well and told Portillo she would contact her to reschedule. Mother did not do so. Instead, Portillo emailed and called mother again on July 22, 2020, to reschedule and inform mother she scheduled a required parental capacity evaluation for August 6, 2020. The Department would have used this evaluation to determine the type and level of services a parent should receive. It would have included substance abuse

- 4 -

and mental health components. Portillo could not reach mother but sent a letter confirming the parental capacity evaluation appointment.

On July 23, 2020, Portillo learned mother was arrested the day before for drug possession. Due to mother's incarceration, Portillo canceled the upcoming evaluation. Mother signed a plea agreement related to both the July and other prior charges, was granted bond, and was released on August 5, 2020. Pursuant to the plea agreement, mother was on supervised probation for two years.

Without the Department's involvement, but compelled by her bond conditions, mother then began an inpatient drug rehabilitation program at Bethany Hall in Roanoke, Virginia, where she stayed until October 19, 2020. During this time, mother was drug tested weekly and participated in therapy and Narcotics Anonymous ("NA") meetings. While the Department knew mother was in this program, Portillo stated she could not remember whether mother informed the Department she was being drug tested. While mother was at Bethany Hall, Portillo contacted mother again on September 2, 2020, to create another visitation plan. Mother had a successful virtual visit with J.P. on September 10, 2020. However, she never visited J.P. again because she missed visitation on September 17 and 24, 2020, and either failed to explain her absence or cited internet connection issues.

On October 14, 2020, Portillo called mother to discuss creating another new visitation plan so mother could resume visitation after she missed visits. Mother told Portillo she would be unable to resume visitation until she was settled into Carter House, a sober-living home in Roanoke she would transition to after completion of the Bethany Hall program on October 19, 2020. Portillo asked mother to notify the Department when she could resume visits. On October 15, 2020, Portillo sent mother a letter summarizing the phone conversation and informing mother

it was important for her to contact the Department when she was settled into Carter House so the parental capacity evaluation could be rescheduled, and visitation could resume.

On October 16, 2020, the JDR court held a foster care review hearing and entered an order that continued the Department's custody of J.P. Mother failed to appear at the hearing.

Over the next month, the Department did not hear from mother until mother called Portillo on November 22, 2020, and left a voicemail. Mother updated the Department on her new address at Carter House, the NA meetings she was attending, and her work schedule. She requested that visitation resume. On November 24, 2020, Portillo returned mother's call and left a voicemail. Portillo did not hear from mother until Portillo called mother again on December 2, 2020. During this conversation, mother said she did not get the prior voicemail because her phone was turned off. Portillo explained to mother that she needed to complete the parental capacity evaluation before visitation could resume. Portillo said mother told her she was still taking NA classes at Carter House, but Portillo was unsure if mother was being drug tested at the time.

After this, mother sent Portillo updated contact information. On December 9, 2020, Portillo sent mother an invite to a FAPT meeting. On December 7, 2020, Portillo sent mother pictures for J.P.'s birthday, and mother did not respond. On the day of the FAPT meeting, mother said she was unable to attend because she could not figure out how to log into the Zoom meeting.

Mother moved out of Carter House on January 5, 2021, but continued to reside in Roanoke. Five days later, she was arrested for methamphetamine possession and a bond violation when she was a passenger in a vehicle that had a pipe with residue in the back seat. Mother claimed the pipe did not belong to her, and she was unaware it was in the vehicle. An investigator also found a syringe in mother's purse. After mother's arrest, she was denied bond

by a magistrate, and her attorney refused to file for bond with the court because mother was already released on bond for her earlier charges. Mother remained incarcerated until July 22, 2021, when the charge was dismissed. While incarcerated, she participated in parenting and substance abuse classes but had no contact with the Department. After mother's release, she lived with a substance abuse counselor in his home in Roanoke and regained employment.

Meanwhile, Portillo learned of mother's arrest and incarceration in mid-January. While mother was incarcerated, Portillo prepared a new foster-care service plan ("the new plan") on January 25, 2021. The new plan changed the goal from reunification or relative placement to adoption because mother "ha[d] made minimal progress completing the responsibilities listed on the plan." The new plan did not pursue relative placement because known relatives, including Peacemaker, were unwilling or unable to care for J.P.

On January 27, 2021, the Department filed a petition for a permanency planning hearing with the new plan, requesting that the JDR court change the permanent goal from return home to adoption. On March 23, 2021, the Department filed a petition requesting the JDR court terminate mother's parental rights to J.P. The JDR court held a permanency planning and termination of parental rights hearing on April 23, 2021. After hearing the evidence, the JDR court terminated mother's parental rights under Code § 16.1-283(C) and approved the goal of adoption. Mother then appealed to the circuit court.

The circuit court heard the appeal on September 7, 2021. After hearing testimony and receiving evidence, the circuit court found by clear and convincing evidence it would be in J.P.'s best interests to terminate mother's parental rights. The circuit court noted J.P. had been in foster care for sixteen months and was doing very well in a stable home. The circuit court then found by clear and convincing evidence mother had been unable or unwilling to remedy substantially the conditions that led to removal. Although the circuit court acknowledged

- 7 -

mother's progress, it was concerned by mother's "track record." Specifically, the circuit court

pointed to mother's drug use and arrests when she was not in confinement or a controlled

environment, her inconsistent contact with J.P. and the Department, and her lack of stability due

to her probation conditions and lack of suitable housing. The circuit court also found the

Department had offered mother services and worked with mother on the plan to return J.P. home,

but mother failed to meet "a number of the terms of that agreement." The circuit court then

terminated mother's parental rights under Code § 16.1-283(C)(2) and approved the goal of

adoption. This appeal followed.

ANALYSIS

The trial court has "broad discretion in making the decisions necessary to guard and to

foster a child's best interests." *Farley v. Farley*, 9 Va. App. 326, 328 (1990). Upon review of a

termination decision, this Court presumes the trial court "thoroughly weighed all the evidence,

considered the statutory requirements, and made its determination based on the child's best

interests." *Fields v. Dinwiddie Cnty. Dep't of Soc. Servs.*, 46 Va. App. 1, 7 (2005) (quoting

*Farley*, 9 Va. App. at 329). Given this, we will not disturb a trial court's judgment based on

evidence heard *ore tenus* "unless plainly wrong or without evidence to support it." *Id.* (quoting

*Logan v. Fairfax Cnty. Dep't of Hum. Dev.*, 13 Va. App. 123, 128 (1991)). When reviewing

termination decisions, "we view the evidence in the light most favorable to the prevailing party

below." *Harrison v. Tazewell Cnty. Dep't of Soc. Servs.*, 42 Va. App. 149, 151 (2004).

A. A Department Must Make Reasonable and Appropriate Efforts to Assist Mother Under
Code § 16.1-283(C)(2).

On appeal, mother alleges the Department provided insufficient services to assist her in

remedying the conditions that led to J.P.'s removal, specifically her substance abuse problems.

She argues Code § 16.1-283(C)(2) contemplates more than advising a parent she can request

substance abuse services in writing. Mother does not argue termination is not in the child's best

- 8 -

interests and admits that she needed more time, and the Department's proper assistance, to remedy substantially the conditions that led to removal.

Under Code § 16.1-283(C)(2), a court may terminate residual parental rights when it finds based on clear and convincing evidence that (1) termination is in the child's best interests and (2) the parent was unwilling or unable to remedy substantially the conditions that led to removal within a reasonable period of time not to exceed twelve months. Additionally, termination is only appropriate under Code § 16.1-283(C)(2) when a department shows by clear and convincing evidence that a parent was provided with "reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies" to remedy the conditions that led to a child's foster care placement.

Whether a department made reasonable and appropriate efforts depends on "the circumstances of a particular case." *Harrison*, 42 Va. App. at 163 (quoting *Ferguson v. Stafford Cnty. Dep't of Soc. Servs.*, 14 Va. App. 333, 338 (1992)). Therefore, a court must necessarily determine whether sufficient efforts are made based on "the facts before the court." *Id.* (quoting *Ferguson*, 14 Va. App. at 339).

In its efforts, a department is "not required to force its services upon an unwilling or disinterested parent." *Tackett v. Arlington Cnty. Dep't of Hum. Servs.*, 62 Va. App. 296, 323 (2013) (quoting *Harris v. Lynchburg Div. of Soc. Servs.*, 223 Va. 235, 243 (1982)). Further, a department has no obligation to offer services to a parent who is incarcerated. *Harrison*, 42 Va. App. at 163-64 (holding it would be "patently unreasonable" to require a department to offer services to a parent who is in long-term custody). This Court in *Harrison* stated this rule exists because a parent's long-term custody leaves a department "no avenue" to offer services aimed at reuniting that parent with a child. *Id.* at 164. However, a parent held in pre-conviction incarceration may be entitled to reasonable services under the circumstances before a department

changes the goal to adoption. *See Cain v. Commonwealth ex rel. Dep't of Soc. Servs. for City of Roanoke*, 12 Va. App. 42, 45-46 (1991) (reversing the trial court's termination of parental rights when the department did not contact a parent while she was held in pre-conviction incarceration for most of the time between removal and the department's change-of-goal to adoption). This Court in *Cain* reasoned that unlike a case of post-conviction incarceration, a parent who is awaiting trial will not necessarily be incarcerated thereafter and made unavailable for rehabilitative services. *See id.* at 46.

B. The Circuit Court Did Not Err in Terminating Mother's Parental Rights when There Was Sufficient Evidence the Department Made Reasonable and Appropriate Efforts to Assist Mother.

Here, the circuit court found termination was in J.P.'s best interests and mother failed to remedy the conditions that led to removal notwithstanding the Department's reasonable and appropriate efforts to assist her. Despite mother's argument, we find the record supports a finding by clear and convincing evidence that the Department made reasonable and appropriate efforts to assist mother. In the over eight months between removal and the Department's change-of-goal to adoption in late January 2021, Portillo attempted to maintain contact with mother even though mother was either incarcerated or irregularly responsive. In the months before Portillo prepared the new plan, she contacted mother by telephone and mail to urge her to comply with the plan, maintain consistent visitation with J.P., complete a parental capacity evaluation, and attend meetings regarding J.P. Despite these efforts, mother did not meet the plan's requirements and did not reciprocate contact with the Department as she was incarcerated or transitioning to different living situations. While mother sometimes explained her absences, other times she did not.

Even though the record shows evidence of mother's improvement in controlled living environments at various times over the eight months, mother did not fully communicate this improvement to the Department or meet the plan's specific requirements. And although the

record shows evidence of mother's improvement beyond the twelve-month period, mother's various transitions presented a barrier to her receiving the Department's offered services, such as scheduled visitation with J.P., within the relevant time period.

Unlike the facts of *Cain*, mother was not in jail for most of the time between removal and the Department's change-of-goal to adoption without the Department contacting her to offer suggestions for rehabilitation. Mother was in jail from July 22, 2020, to August 5, 2020, and January 10, 2021, through termination on April 23, 2021. Before and in between mother's incarcerations, Portillo met with mother and contacted her multiple times to urge her to comply with the plan's requirements. Portillo particularly urged mother to complete a parental capacity evaluation that contained a substance abuse component. Additionally, the plan that mother and Portillo reviewed together on June 16, 2020, required mother to submit to drug testing and stated mother needed to request substance abuse services in writing. While requiring a parent struggling with substance abuse issues to request services in writing may not be the most effective method of assistance, the Department informed mother of this treatment option and was not required to force substance abuse services on mother.[2] Under these circumstances, we find the record supports the circuit court's determination the Department made reasonable and appropriate efforts to assist mother in the months between removal and its change-of-goal to adoption.

---

[2] Aside from Portillo's continued attempts to schedule the parental capacity evaluation, the record contains no evidence the Department encouraged mother to take advantage of substance abuse services, even though it knew mother had drug problems. While the Department is not required to force substance abuse services on a disinterested parent, it surely could offer more proactive facilitation of these services, beyond the uniform substance abuse services language contained in the plan, to parents facing these issues.

CONCLUSION

The circuit court did not err in finding the Department made reasonable and appropriate efforts to assist mother as required by Code § 16.1-283(C)(2).  Therefore, the circuit court did not err in terminating mother's parental rights.  For the foregoing reasons, we affirm the circuit court's decision.

*Affirmed.*